UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:13-cr-00108-JAW |
| | ) |
| NICHOLAS MCDONALD, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Nicholas McDonald is charged in a two-count indictment with (1) possession with intent to distribute a mixture or substance containing heroin, and aiding and abetting such conduct, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and (2) possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). Evidence against him was obtained as a result of a traffic stop on April 5, 2013. McDonald filed a motion to suppress the evidence based on an assertion that the traffic stop was not supported by reasonable articulable suspicion. The court referred the motion for report and recommendation and I conducted an evidentiary hearing on September 5, 2013. I now recommend that the court adopt the factual findings set forth below and deny the motion to suppress for reasons set forth in the following discussion.

**PROPOSED FINDINGS OF FACT**

The following proposed findings are based primarily on the testimony of three law enforcement officers called by the United States (Officer Greeley, Officer Nickerson, and Sgt. Peary) and government exhibit 1. The defendant called a single witness, Private Investigator Phil Latacz, to address a matter related to speed limits in the area near the traffic stop. All of the

witnesses were credible, though the speed limit issue is of marginal significance in light of a constellation of circumstances justifying the traffic stop.

On the afternoon of April 5, 2013, Sergeant Roy Peary of the Penobscot County Sheriff's Department noted on the "Spillman system"[1] an email concerning a report of suspicious pawning activity at a Newport, Maine pawnshop. The email indicated that Kelly Jo Desmond and Jarod Brown were actively trying to pawn construction tools and various electronics and were in the company of another female whose identity was undetermined. The email further indicated that their vehicle was an older, brown colored Pontiac with faded and peeling paint on the hood, bearing a plate number 7450 followed by undetermined letters. The stolen tools included a chop saw, an air compressor, and a welder. It was reported that the individuals attempting to pawn the items did not appear to have much information about them, which was described as the reason for the suspicion. (Gov't Ex. 1.)

That same afternoon, Sgt. Peary learned of a new investigation into a reported burglary in Orrington, Maine. The burglary complainant reported the theft of construction tools from his garage. Peary joined the investigation and traveled to the residence. Among the tools reported as missing by the burglary complainant were a chop saw and a welder. The complainant suspected an ex-girlfriend was involved in the burglary and gave her name as Amy White. He said that White struggled with drug addiction and was one of few people who knew of the existence of his tools. In their discussion, Peary disclosed information related to the recent report of suspicious pawning activity. The complainant indicated that Ms. White drove a maroon Pontiac Bonneville with flaking paint on the hood. He also reported that Ms. White may be staying at a trailer park on Route 46 in Holden. Either of his own initiative or upon questioning,

---

[1] This computerized system is used by local law enforcement agencies to keep each other abreast of developing information.

the complainant was able to name Nick McDonald and Kelly Jo Desmond as the residents of the trailer in question.

Following an inquiry to the Maine Department of Motor Vehicles, Peary learned that White was the registered owner of a 1999 Pontiac Bonneville, listed as purple in color, with plate number 7450 TB. Peary, quite reasonably, suspected there must be a connection between the burglary and the suspicious pawning activity.

Officer Chris Greeley received a call from Sgt. Peary on the afternoon of April 5 and learned that Peary was investigating a burglary and suspicious pawning activity. Greeley knew at that time or learned shortly thereafter that arrest warrants existed for both McDonald and Desmond. Although the warrants did not necessarily give a Holden address for McDonald or Desmond, Greeley suspected that McDonald was staying in the Holden trailer park because on one late evening/early morning in February 2013 he picked up McDonald along the roadway and drove McDonald to the trailer, which Greeley identified as having a 9 High Street address. Furthermore, Greeley had a conversation with the owner of the park in either February or April and the owner told him McDonald was living there. Greeley called Maine DEA Task Force Agent Amy Nickerson (currently a patrol officer with the Brewer Police Department) and solicited her participation in the investigation.

Agent Nickerson joined Sgt. Peary at the scene of the burglary on April 5. Through her work with the Task Force, Nickerson associated McDonald and Desmond with an ongoing drug investigation. She, too, spoke with the burglary complainant and gathered information regarding Amy White and her connection with McDonald and Desmond. Unlike Peary, Nickerson was familiar with the trailer in question, which she described as having an address of 9 High Street.

Nickerson had twice conducted surveillance on the trailer in March 2013.[2] Nickerson was able to learn from the burglary complainant that Amy White had once confided in him that she had been driving McDonald to Massachusetts to pick up drugs.

Based on this collection of information, Greeley, Nickerson, and Peary decided to meet at the Holden Police Department at 19:00 hours to determine the next step in their investigation. From there, Nickerson drove to the trailer park in an unmarked cruiser to determine whether the Bonneville was at the 9 High Street address. She determined that it was and noted a license plate number of 7450 TB. Nickerson left the trailer park and traveled a short distance down Route 46 toward Route 1A to wait and see whether the Bonneville would leave. At 19:55 she saw the Bonneville leaving and called to report the same to Officer Greeley, Sgt. Peary, and others. She followed the Bonneville, which turned onto Route 1A and travelled in the direction of the Holden Police Department. Nickerson could not identify the occupants, but could see that there were two people in the vehicle. Nickerson explained that she did not intend to pull the vehicle over at that time because she wanted assistance with the stop, having obtained information that McDonald may be in possession of a firearm. Nickerson observed that the Bonneville was travelling at what she considered to be a slow rate of speed for the roads in question. Based on her speedometer she thought the rate of speed was about ten miles per hour below the limit.

Meanwhile, Greeley waited in a marked police cruiser at the Department's exit onto Route 1A and Nickerson slowed her own vehicle to allow Greeley to pull in behind the Bonneville. Greeley could see that there was a female driver and a male occupant but could not positively identify either. The Bonneville continued to travel on Route 1A for slightly under one mile before signaling to turn left onto the Copeland Hill Road. In this interval the vehicle

---

[2] Although Nickerson conducted surveillance on the trailer in March, during that surveillance she never saw White, McDonald, or Desmond at the trailer and never saw the Bonneville parked there, either.

traveled at what Officer Greeley described as an unusually slow, 35-mph rate of speed compared to the ordinary rate of traffic on Route 1A. According to Greeley, a line of cars had developed behind the Bonneville and Officer Nickerson by the time the Bonneville reached the Department. As Greeley followed the vehicle and approached the Copeland Hill Road, its break lights came on three times, without any connection to traffic lights or signs, which caused Greeley to suspect that the car was preparing to stop so occupants could flee. Moreover, the car had continued to travel at roughly 35 mph even though the limit had increased to 45 mph. Greeley decided he would make the stop on the Copeland Hill Road.³ When he turned on his cruiser's lights, the Bonneville pulled to the side of the Copeland Hill Road and its passenger, who turned out to be McDonald, exited the car and fled into the woods. Greeley and Nickerson detained the driver, Amy White. Among the items observed in the back seek were some construction tools. Subsequent searches of White, the car, and containers within the car turned up narcotic evidence and a gun. Additional drug evidence was recovered from McDonald following his apprehension later that evening.⁴

The final witness was Mr. Latacz, whom defense counsel called to supply testimonial and pictorial evidence related to the speed limit signs posted on Route 1A between the intersection with Route 46 and the intersection with the Copeland Hill Road. The presentation was accurate in all respects and it is true that portions of this stretch of road are marked 35 mph. However, the final stretch leading up to the Copeland Hill Road is posted at 45 mph.

---

³ Greeley testified that he lowered his window just before making the stop because that is something he does prior to stopping motor vehicles. He included in his police report a statement that the Bonneville's exhaust was "a bit" loud. Asked to address this on cross-examination, Greeley responded that he thought the vehicle had an abnormal sound but that he did not really regard the sound or the slow speed as particularly significant. Greeley testified that he would have pulled the Bonneville over even if all he knew was the information related to the burglary investigation.

⁴ See Motion to Suppress at 18-19; see also Greeley Report, ECF No. 24-1.

**DISCUSSION**

McDonald challenges the justification for the traffic stop. (Motion to Suppress at 1, ECF No. 24.) He contends that the arrest warrants would not have supplied suspicion to stop the vehicle because Greeley did not know that either McDonald or Desmond was in the Bonneville and because the Bonneville was registered to Amy White, who did not have a warrant out for her arrest. (Id. at 9-10.) Additionally, McDonald argues that the stop was unjustified because the burglary and pawning-activity investigations did not indicate his involvement and because the investigations had grown stale by the time of the stop, with no valid basis to suspect ongoing criminal activity associated with the Bonneville, and without knowing that suspects were actually present in the vehicle. McDonald says that suspicion targeting a vehicle alone is insufficient and that there must be reasonable suspicion focused on a known occupant to support a traffic stop. He further argues that the officers should not have made the stop without confirming that the items observed at the pawn shop actually were the items taken from the burglary complainant's home. (Id. at 10- 14.) Finally, McDonald argues that the slow rate of travel and the "a bit loud" exhaust did not provide sufficient independent grounds to stop the Bonneville. (Id. at 14-18.) McDonald seeks the suppression of all evidence obtained on the evening of the stop as "fruit of the poisonous tree," citing Wong Sun v. United States, 371 U.S. 471, 488 (1963). (Id. at 19.)

In response, the United States argues that the investigation generated reasonable suspicion that Amy White was connected both with the burglary and with the vehicle involved in the pawn shop activity, which vehicle could reasonably by suspected of carrying items stolen in the burglary, and that these circumstances would lead any reasonable officer to seek out White's

6

vehicle and pull it over to question its driver and any occupants regarding the Orrington burglary and the pawning activity in Newport. (Response at 5, ECF No. 25.)

The United States has the better of this argument. McDonald's focus on the absence of definite knowledge of the identities of the Bonneville's occupants is misplaced. Officers are frequently called upon to make traffic stops in situations where they are unaware of who is actually in a vehicle and cannot say with certainty that a crime is underway. E.g., United States v. Arvizu, 534 U.S. 266 (2002); United States v. Cortez, 449 U.S. 411 (1981).[5] Although the protections of the Fourth Amendment extend to investigatory traffic stops, "the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause" when officers merely seek to perform a brief stop and inquiry. Arvizu, 534 U.S. at 273 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). The fact that someone is traveling in a motor vehicle does not raise the standard for conducting an investigatory stop. Arizona v. Johnson, 555 U.S. 323, 327 (2009). In such cases, the intrusion is lawful so long as the stop is supported by a reasonable suspicion that criminal activity "may be afoot." Id. (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The government bears the burden of satisfying the reasonable suspicion standard. United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). A court's review of an officer's reasonable suspicion determination must be based on the totality of the circumstances "to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks and citation omitted). Officers can draw on their experience and training in order to infer

---

[5] Although Arvizu and Cortez both involve traffic stops near the Mexican border and do not have a lot in common with this case, they illustrate well the basic fact that officers routinely form "a particularized and objective basis for suspecting the particular person stopped of criminal activity," Cortez, 449 U.S. at 417-18, without being able to positively identify the person in question. This is true in the mine run of traffic stops, including stops for suspected impaired driving. See, e.g., Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (speaking of suspicion focused on "a particular person" but involving the stop of an unidentified driver). Fourth Amendment law did not require the officers to know that Desmond, McDonald, or White was present in the vehicle.

relationships among the facts and circumstances. These inferences do not depend on probable cause. The reasonable suspicion standard "falls considerably short of satisfying a preponderance of the evidence standard." Id. at 274. However, officers may not justify investigatory stops based on mere "inarticulate hunches." Terry, 392 U.S. at 22.

This case does not involve a mere hunch. For all of the reasons itemized by the United States in its response, the officers had a reasonable basis to suspect that Amy White and her Pontiac Bonneville might be connected with recent criminal activity and might still be involved in transporting stolen goods. The totality of the circumstances demonstrate several particularized and objective facts supporting a suspicion of specific legal wrongdoing, including White's association with the burglary complainant, her asserted difficulties with a drug-dependent life style, the fact that drug seekers often resort to property crime to support their habits, White's connection with Kelly Jo Desmond, Desmond's connection with the suspicious pawning activity, the similarity between the goods involved in the pawning activity and the goods taken in the burglary, the likely use of White's Bonneville in the pawning activity based on color and plate information and Desmond's participation, the fact that not all of the goods were accepted by the pawn broker so that some might remain in the Bonneville, the lack of a significant passage of time between the reported pawning activity and the stop, the presence of the Bonneville that evening at the trailer known to be associated with Desmond, and even the overly cautious driving speed and suspicious application of the Bonneville's brakes immediately prior to the stop.[6] Certainly this suspicion would have been more powerful if someone had seen the Bonneville in the vicinity of the Orrington burglary, or if it was known that White participated in the pawning activity in Newport, or if the officers had definitively determined that the construction tools

---

[6] It does not matter whether the Bonneville's speed and braking activity could justify a stop standing alone. These facts are part of a much broader constellation of facts and circumstances, all of which made the traffic stop entirely reasonable for purposes of the Fourth Amendment.

8

shown to the pawn shop owner were the very same tools taken from the Orrington home and not just the same kind of tools (some of the shortcomings highlighted by McDonald in his motion and reply (ECF No. 27)). Nevertheless, the facts and circumstances known to the officers included enough particularized and objective facts to support their suspicion that criminal activity was afoot and that the persons in the Bonneville who had just come from the Desmond trailer might yet be participating in that activity.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court DENY McDonald's Motion to Suppress (ECF No. 24).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 9, 2013